**Danny L. BROWN**

v.

**STATE of Rhode Island.**

**No. 2004–212–Appeal.**

Supreme Court of Rhode Island.

Feb. 11, 2009.

Present: WILLIAMS, C.J., FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

A Superior Court jury found Danny L. Brown guilty of three counts of first-degree sexual assault and three counts of first-degree child molestation. The trial justice sentenced him to forty years imprisonment on each count, to be concurrent, with twenty years to serve at the Adult Correctional Institutions, and the other twenty years suspended, with probation. Brown filed a direct appeal of his convictions, and we affirmed. *State v. Brown,* 709 A.2d 465 (R.I.1998). On April 12, 2000, Brown launched a collateral attack on his convictions by filing an application for postconviction relief. On January 23, 2004, a Superior Court justice granted Brown's application and vacated his sexual-assault and child-molestation convictions. The hearing justice ruled that Brown's trial attorney, John H. Brown, did not provide effective assistance of counsel to such a degree that Brown's constitutional right to a fair trial had been violated. The state timely appealed and Brown filed a cross-appeal. For the reasons set forth in this opinion, we vacate the Superior Court order granting Brown's application for postconviction relief and we reinstate the judgments of conviction.

## I

### Facts and Travel

Brown was indicted for sexually molesting his stepdaughter, Emily.[1] During a three-day trial in the Superior Court, Emily testified that Brown's abusive conduct

Robert B. Mann, Providence, for Plaintiff.

Christopher R. Bush, Department of the Attorney General, for Defendant.

1. The names of the complainant and her mother have been changed to protect their privacy.

toward her began just after Brown moved in with her mother, Julie, during the summer of 1983. Emily, who was eight years old when the abuse began, testified that it started with Brown fondling her breasts and vaginal area and that it eventually escalated to oral sex and sexual intercourse. She said that the abuse continued on a regular basis for over two years, until November 1985, just before Brown married Julie.

Emily told no one of the abuse while it was ongoing because Brown said "not to tell anybody. It was our secret."[2] However, in the fall of 1991, Elizabeth Janikuak, the pastor at the Living Waters Foursquare Gospel Church in Smithfield, which the family attended, began to notice that Emily was "manifest[ing] some real angry behavior."[3] Janikuak testified that she asked Emily why she was so angry, and eventually Emily disclosed to her that Brown had sexually abused her. Janikuak testified at trial that she was "very cautious to make sure that what [Emily] was telling me was the truth because we're trained to be sure that just because someone makes an allegation does not mean it's true." Janikuak said she informed Brown about Emily's accusations and, at first, he denied that anything improper had occurred between them. Eventually, however, Brown told the pastor that on one

occasion Emily approached him while he was sleeping on the couch, reached into his underwear, and fondled his penis. At trial, Brown repeated this version of events. He told the jury that he first believed it was his wife waking him up, but that when he realized it was Emily's hand in his pants, he scolded her.

Janikuak testified that after speaking with Brown, she referred both him and Julie to Richard Tanguay, M.D., for counseling.[4] The couple met with Dr. Tanguay on December 12, 1991, and they discussed a number of issues, including Emily's allegations of sexual abuse. Doctor Tanguay later testified that during the meeting, Brown's demeanor "was one of admission, yes, [that] something of a sexual nature did occur between himself and [Emily]." He said that Brown "made an admission of sexual abuse against his stepdaughter, and * * * as the conversation unfolded it was more significant than I had been led to believe in the beginning." After the prosecutor asked Dr. Tanguay whether he recalled Brown's response when the issue of sexual abuse was raised, the witness testified, "if my memory serves me right, and this is very typical in sexual abuse cases with the offender particularly, there's [sic] seems to be some minimization, minimizing of what happened." Julie also testified that during the counseling session with Dr.

2. In 1989, while watching a television show with Julie about the sexual abuse of children, Emily proclaimed, "that happened to me;" she did not, however, at that time, identify Brown as the person who abused her.

3. The pastor has been referred to as "Janiak" and "Janikuak" by this Court in the past. *State v. Brown*, 709 A.2d 465, 468 (R.I.1998); *State v. Brown*, 690 A.2d 1336, 1337 (R.I. 1997). The transcripts and the briefs submitted to us refer to her as "Janikuak" and that is the spelling that we will use in this opinion.

4. Doctor Tanguay was also a pastor at the Upper Room Foursquare Church in Wilming-

ton, Connecticut; before that he was a minister for eighteen to twenty years in a different denomination. He said that on three or four occasions, Janikuak had referred individuals to him for counseling. Janikuak testified that she referred Brown and Julie to Dr. Tanguay because "[h]e's a Christian psychiatrist and former pastor and very good in that. He works with people with addictive problems, sexual abuse, and the whole bit." Doctor Tanguay described the meeting with Brown and Julie as a "consult * * * to see if there was any interest in their getting into therapy for the alleged problem."

Tanguay, Brown admitted, in her presence, that he abused Emily "two to three times in a month." [5]

On November 30, 1994, a jury convicted Brown of three counts of first-degree sexual assault and three counts of first-degree child molestation. The trial justice sentenced Brown to concurrent terms of forty years for each count, with twenty years to serve and twenty years suspended, with probation that would begin when he was released from incarceration. This Court affirmed his conviction.[6] In April 2000,

Brown filed an application for postconviction relief.[7] He included myriad claims for relief, including that his trial attorney, John Brown, did not provide effective assistance of counsel and that, as a result, his constitutional right to a fair trial had been compromised.[8] Brown based his claim of ineffective assistance on four grounds. He contended that John Brown: (1) did not challenge the sexual-assault charges on statute of limitations grounds; (2) did not challenge the grand jury indictment as fatally flawed because Janikuak was allowed to testify in violation of G.L.

---

**5.** Emily did not fully detail the extent of her abuse until April 7, 1992, when, at a meeting with Janikuak and Julie, Emily finally disclosed the full degree of Brown's abuse. Shortly thereafter, Julie reported the information to the authorities, and criminal proceedings soon began against Brown.

**6.** In a *per curiam* opinion dated March 5, 1997, a four-justice panel of this Court dismissed Brown's appeal on two of the issues he raised but also indicated that the panel was evenly divided on the remaining four claims of error. *Brown*, 690 A.2d at 1336–37. Consequently, this Court affirmed the convictions. *Id.* at 1337. Brown immediately moved to reargue his appeal as soon as a fifth justice was available, and we granted his request for the limited purpose of examining the four issues that originally had evenly divided this Court. After reviewing these issues with a fully constituted court, we ultimately affirmed his conviction. *Brown*, 709 A.2d at 481.

**7.** Under G.L.1956 § 10-9.1–1, a defendant may file an application for postconviction relief if he or she believes that his or her constitutional rights were violated. The statute provides in pertinent part:

"(a) Any person who has been convicted of, or sentenced for, a crime, a violation of law, or a violation of probationary or deferred sentence status and who claims:

"(1) That the conviction or the sentence was in violation of the constitution of the United States or the constitution or laws of this state; * * * may institute, without paying a filing fee, a proceeding under this chapter to secure relief.

"(b) This remedy is not a substitute for nor does it affect any remedy incident to the proceedings in the trial court, or of direct review of the sentence or conviction. Except as otherwise provided in this chapter, it comprehends and takes the place of all other common law, statutory, or other remedies heretofore available for challenging the validity of the conviction or sentence. It shall be used exclusively in place of them."

**8.** Brown also alleged in his application that the trial justice impermissibly restricted John Brown's cross-examination of Janikuak about: (1) whether she knew that Emily previously attended counseling; (2) her bias, prejudice, and motive in regard to a lawsuit that Brown's cousin filed against her; and (3) when the sexual-assault allegations were reported to law enforcement. Brown also alleged that the prosecutor: (1) withheld the names and addresses of all of the health care providers from whom Emily sought treatment beginning in June 1983; (2) obtained a conviction through a "persistent pattern of perjury and deliberate distortion of the facts;" and (3) engaged in misconduct during his closing argument. He contended that the appellate prosecutor engaged in misconduct by deliberately misleading this Court about when Brown's daughters began living with him. Brown also alleged that the trial justice erred when he allowed Janikuak and Dr. Tanguay to testify to confidential communications in violation of G.L.1956 § 9–17–23 and that his appellate counsel provided ineffective assistance when she failed to raise certain issues on appeal notwithstanding Brown's request that she do so.

1956 § 9–17–23;[9] (3) did not file a motion for a new trial after a reference to Emily receiving counseling appeared in the presentence report; and (4) did not object when the prosecutor, in his closing argument, used allegedly perjured testimony about the couple's pending divorce. Brown amended his postconviction-relief application to add an additional claim of ineffective assistance of counsel. In this amendment, he alleged that John Brown should have asserted the "clergy privilege" set forth in § 9–17–23 during the trial, and on that basis he should have objected to the testimony of Janikuak and Dr. Tanguay.[10]

Because Brown was indigent, the Superior Court appointed attorney Mary June Ciresi to represent Brown in his quest for postconviction relief. On January 23, 2003, Ciresi filed a "no-merit" memorandum and a motion to allow her to withdraw from the case in accordance with this Court's holding in *Shatney v. State*, 755 A.2d 130, 136–37 (R.I.2000) (articulating the standards that should govern the actions of appointed counsel who seek to withdraw from a postconviction-relief proceeding after concluding that an application is meritless). She concluded that Brown's application lacked merit because, even though she disagreed with the manner in which attorney John Brown had handled Brown's criminal case, she did not believe his performance met the standard necessary to carry a successful claim of ineffective assistance of counsel.[11] A Superior Court justice reviewed Ciresi's memorandum and allowed her to withdraw from the case; Brown proceeded *pro se.*

Over the span of the next eleven months, the Superior Court conducted a series of hearings on Brown's application for postconviction relief. Brown presented the testimony of four witnesses, including

9. At the time of Brown's trial, § 9–17–23 provided that:

"In the trial of every cause, both civil and criminal, no clergyman or priest shall be competent to testify concerning any confession made to him in his professional character in the course of discipline enjoined by the church to which he belongs, without the consent of the person making the confession. No duly ordained minister of the gospel, priest or rabbi of any denomination shall be allowed in giving testimony to disclose any confidential communication, properly entrusted to him in his professional capacity, and necessary and proper to enable him to discharge the functions of his office in the usual course of practice or discipline, without the consent of the person making such communication."

Section 9–17–23 was amended by the General Assembly in 1997. The 1997 Reenactment (P.L.1997, ch. 326, § 1) substituted "no member of the clergy" for "no clergyman" in the first sentence, substituted "the communication" for "such communication" at the end of the last sentence, and made minor punctuation and stylistic changes throughout the section.

10. In Brown's initial application for postconviction relief, he argued that the trial justice committed reversible error in violation of § 9–17–23 by allowing Janikuak and Dr. Tanguay to testify. In Brown's amended application, in which he includes the clergy-privilege argument as part of his ineffective-assistance claim, he argues only that John Brown was ineffective for not objecting under § 9–17–23. He does not specifically contend that John Brown was ineffective for not objecting to the testimony of both Janikuak and Dr. Tanguay. In light of his initial application, however, it seems clear to us that that was his intention and we will review the application accordingly.

11. Ciresi also concluded that Brown's application was meritless because: (1) this Court already rejected the claims regarding the cross-examination of Janikuak; (2) the state did not deliberately withhold information from the defense nor did it cause a violation of Brown's constitutional rights; (3) the prosecutor did not engage in prosecutorial misconduct; and (4) his appellate counsel did not provide ineffective assistance.

524

John Brown.[12] The attorney testified about a number of issues, including: (1) that he represented Al Brown, Brown's cousin, and another man, in a lawsuit against Janikuak; (2) that he did not receive any documents from the Rape Crisis Center about Emily before the trial, despite the fact that the presentence report revealed that Emily had been in counseling; (3) that he did not move to dismiss the indictment as time-barred; and (4) that he did not believe that the clergy privilege applied to Janikuak's conversations with Brown.

As the postconviction-relief process began to wind its way to a conclusion, the hearing justice said that she needed a record of Brown's testimony because many of his comments during the hearings had not been under oath. She declared: "It's very important and critical in my mind to the decision, especially with regard to ineffective assistance of counsel." The hearing justice then directed Brown to compose a list of questions that he would want an attorney to question him on in this matter. Additionally, this colloquy transpired between the hearing justice and Brown:

THE COURT: "And you know, don't forget about the records, the Rape Crisis records and any representations that were made to you by counsel concerning that. Anything your council [sic] may have said to you with regard to strategy or objections, if—the bolstering of the testimony issue by the pastor is another issue that I want to explore, and because you are bringing this action, you realize that, you know, the confidentiality privilege has now terminated, so those communications can now be made part of the record. So I want you to think really hard about that, not so much about the statute of limitations issue because that's not where ineffective assistance comes in.

BROWN: "Excuse me?

THE COURT: "It's not so much like the statute of limitations issue, I don't really think you need to focus on I need to focus on that counsel issue. And I know you've read it a lot of times, but reread the Supreme Court decision with reference to the rulings and the portions of the transcript where your lawyer was making objections, for example, with the bolstering issue. There were four dif-

12. Besides John Brown, Brown presented the testimony of: (1) his cousin, Al Brown; (2) his daughter from a previous marriage, Marie Brown; and (3) the prosecutor during the trial, John McMahon. Al Brown testified that he worked on a construction project at Janikuak's church in Smithfield, but that after he completed half the work, Janikuak hired a different contractor to finish the job for less money. He testified that he never was paid and that he filed a mechanic's lien and sued Janikuak to recover payment for his services. It appears that the purpose of this testimony was to support Brown's contention that the trial justice erred when he restricted John Brown's cross-examination of Janikuak about the lawsuit and her potential bias; however, we have already rejected this claim in Brown's direct appeal. *Brown*, 709 A.2d at 473. The next witness, Marie, testified about her relationships with Brown, Emily, and Julie, as well as about a false rape charge that she filed against a former boyfriend when she was fourteen years old. It does not appear that Brown elicited Marie's testimony to demonstrate John Brown's ineffectiveness, but rather to rebut some facts to which Julie testified at trial, and also to establish how "easy [it is] to file a false rape charge against somebody." McMahon testified to a plethora of issues, including: alleged inconsistencies between witnesses' trial testimony and previous statements, the lawsuit between Al Brown and Janikuak, the Rape Crisis Center records, the applicability of the clergy privilege, whether a statute of limitations defense applied to the charges against Brown, whether Julie reported the sexual abuse to the Department of Children, Youth and Families, and a number of objections that were raised at trial.

ferent grounds that they ruled—(interrupted)

BROWN: "That they split on?

THE COURT: "No. Four different grounds that the majority opinion, with reference to the one objection, that they cited and—(interrupted)

BROWN: "I didn't raise none of those issues in the post conviction relief.

THE COURT: "You did indirectly. You did indirectly. But I'm concerned—I'm zeroing in on ineffective assistance, on the issues that the majority opinion upheld the trial justice, the records, the testimony of the pastor—(interrupted)

BROWN: "Which records, the medical records?

THE COURT: "Both. You told me, not under oath, and not that I am doubting this, but for purposes of the procedure, I need to have you under oath, the Kent County records were subpoenaed, and you got that—only that one page, which looked to me like an attempted suicide over the argument about the book, the Rape Crisis—this is another thing in the presentence report, Mr. Brown, after, that was the first time I believe that you learned that she had had counseling for four months prior to the trial, is that correct?

BROWN: "Yes."

■ At a subsequent hearing, Brown answered thirty-eight questions that the hearing justice posed to him from a list that he had compiled, as well as other questions that the hearing justice asked on her own initiative. In a written decision, filed on January 23, 2004, the hearing justice granted Brown's application for post-conviction relief. In her decision, she reviewed this Court's opinion from Brown's appeal, and noted that "some of [Brown's] claims mimic issues raised in his direct appeal." After outlining those claims, the hearing justice found that John Brown was ineffective in his representation of Brown at his trial. However, she based her finding on a number of issues that were not included in either Brown's original application or the amendment thereto and that were not addressed during the course of the postconviction hearings. Instead, the hearing justice found that Brown did not receive effective assistance of counsel because John Brown: (1) failed to object to Janikuak's testimony about her training concerning discernment of truth, which the hearing justice said constituted impermissible bolstering; (2) failed to raise timely discovery objections and/or press for production of notes that Janikuak testified that she took during her meetings with Emily and Brown, notes that the hearing justice concluded "may have been critical material in this credibility case;" (3) failed to object to Dr. Tanguay's testimony that he thought Brown was in denial, reasoning that that testimony constituted bolstering or vouching, essentially offering "expert" opinion regarding the credibility of both Emily and Brown; (4) called Brown's daughter [13] as a witness who testified that Emily told her that Brown molested her; and (5) failed to review police reports and witness statements with Brown before his trial. The hearing justice concluded: "This Court is of the opinion that the fairness of [Brown's] trial was severely compromised by the lack of effective representation, which is his Constitutional en-

---

13. Brown points out that the Superior Court decision incorrectly referred to the witness as Emily's sister; however, she was, in fact, Brown's daughter. This confusion may have arisen because Emily's sister also testified at trial; nevertheless, it is clear from the Superior Court decision, and we have no doubt, that the hearing justice was referring to the testimony of Brown's daughter and not Emily's sister.

titlement. The convictions are the product of an infirm process resulting in an extinguishment of [the applicant's] core Constitutional rights." On this basis, the hearing justice granted Brown's *pro se* application for postconviction relief.[14]

The state argues that the hearing justice erred when she impermissibly inserted herself into the adversarial process and granted Brown's application based on issues: (1) that this Court previously rejected in Brown's direct appeal; (2) that Brown did not raise in either his initial or amended application; (3) that were not supported by facts in the record; and (4) that the parties never litigated. Brown filed a cross-appeal, in which he raises a number of issues that seem to fit into one of two categories. They are: (1) issues that Brown argues may have contributed to the hearing justice's finding of ineffective assistance; and (2) issues that Brown raised in his application but that the hearing justice did not address in her decision, which he argues was error. He asks this Court to grant his cross-appeal on either of these two alternate grounds.

## II

### Standard of Review

The Sixth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution provide that in all criminal prosecutions, the accused shall enjoy the right to the assistance of counsel in his or her defense. "In accordance with G.L.1956 § 10–9.1–1(a)(1), postconviction relief is available to a defendant who demonstrates that his conviction or sentence violated his rights under the state or federal constitution." *Bryant v. Wall*, 896 A.2d 704, 706 (R.I.2006). "[A]n applicant bears the burden of proving, by a preponderance of the evidence, that he is entitled to postconviction relief." *Chalk v. State*, 949 A.2d 395, 398 (R.I.2008) (quoting *Burke v. State*, 925 A.2d 890, 893 (R.I.2007)). "When this Court reviews a hearing justice's determination with respect to an application for postconviction relief, we will not disturb the findings of the hearing justice 'absent clear error or a showing that the [hearing] justice overlooked or misconceived material evidence.'" *Thornton v. State*, 948 A.2d 312, 316 (R.I.2008) (quoting *State v. Thomas*, 794 A.2d 990, 993 (R.I.2002)); *see also Gonder v. State*, 935 A.2d 82, 85 (R.I.2007). However, "this Court must review *de novo* the ultimate question of whether a defendant's constitutional rights were infringed * * *." *Kholi v. Wall*, 911 A.2d 262, 264 (R.I.2006) (quoting *Brown v. State*, 841 A.2d 1116, 1124 (R.I.2004)). "Finally, findings of historical fact, and inferences drawn from those facts, will still be accorded great deference by this Court, even when a *de novo* standard is applied to the issues of constitutional dimension." *Gonder*, 935 A.2d at 85 (quoting *Thomas*, 794 A.2d at 993); *see also Sosa v. State*, 949 A.2d 1014, 1016 (R.I.2008); *Ouimette v. State*, 785 A.2d 1132, 1135 (R.I.2001).

This Court has adopted the standard set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d

14. The hearing justice issued her decision on January 23, 2004. The state filed its notice of appeal on February 10, 2004, and Brown filed his cross-appeal on February 23, 2004. However, an order granting Brown's application for postconviction relief was not entered until August 4, 2005. We repeatedly have said that we treat premature appeals as timely filed. *See State v. McManus*, 950 A.2d 1180, 1181 n. 2 (R.I.2008) (mem.) (citing *State v. Hesford*, 900 A.2d 1194, 1197 n. 3 (R.I.2006)). Further, an order that grants an application for postconviction relief is considered a final judgment for purposes of appeal to this Court. *See* §§ 10–9.1–7, 10–9.1–9.

674 (1984), to determine when a defendant should be granted relief from a conviction because of ineffective assistance of counsel.[15] That standard makes use of a two-pronged test. *Id.* at 687, 104 S.Ct. 2052. First, the applicant must prove that the trial counsel's performance was so deficient that he or she was not functioning as counsel. *Id.* "This prong can be satisfied 'only by a showing that counsel's representation fell below an objective standard of reasonableness.'" *Rodriguez v. State,* 941 A.2d 158, 162 (R.I.2008) (quoting *Brennan v. Vose,* 764 A.2d 168, 171 (R.I.2001)). Second, the applicant must demonstrate that he or she was prejudiced by the deficient performance to such a degree as "to amount to a deprivation of the applicant's right to a fair trial." *Id.* (quoting *Brennan,* 764 A.2d at 171). This second prong "is satisfied only when an applicant demonstrates that 'there is a reasonable probabil-

ity that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Tarvis v. Moran,* 551 A.2d 699, 700 (R.I.1988) (quoting *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052).

## III

### Analysis

The critical issue Brown raised in his application for postconviction relief is whether his trial counsel deprived him of his right to effective assistance of counsel.[16] Review of the order granting

---

**15.** This Court has noted that rarely does a defendant who has been represented by private counsel succeed in later questioning, in postconviction proceedings, the ineffectiveness of the trial counsel that the defendant chose to represent him or her at trial. *Larngar v. Wall,* 918 A.2d 850, 856 (R.I.2007); *see also Hassett v. State,* 899 A.2d 430, 434 n. 3 (R.I.2006) ("when a person selects his or her own attorney, any alleged deficiencies seldom amount to an infringement of one's constitutional rights"). "We have also indicated that the trial performance of a privately retained defense attorney cannot be said to have infringed a defendant's constitutional rights 'unless the attorney's representation [was] so lacking that the trial [had] become a farce and a mockery of justice * * *.'" *Larngar,* 918 A.2d at 856 (quoting *Heath v. Vose,* 747 A.2d 475, 477 n. 1 (R.I.2000)). Despite the fact that Brown retained private counsel, we believe that even when analyzing this case under the two-pronged test enunciated by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), Brown cannot meet his burden. Therefore, we do not need to address whether John Brown's representation was so lacking that Brown's trial became a farce and a mockery of justice.

**16.** Brown cited ten grounds in his application for postconviction relief. In *State v. Carvalho,* 450 A.2d 1102, 1104 (R.I.1982), this Court held that "a defendant generally may not divorce himself from responsibility for his counsel's failure to present issues on direct appeal, absent a claim that counsel's failure to raise such issues resulted in a denial of the defendant's right to effective assistance of counsel." Any other issues forming the basis for a defendant's application for postconviction relief that were available for direct review and not raised are deemed waived. *Id.; see also* G.L. 1956 § 10-9.1-8. In Brown's application, he claimed that his appellate counsel was ineffective because she failed to raise the issue of the Rape Crisis Center records and other issues on direct appeal. We see no merit in this argument because "appellate counsel * * * need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Chalk v. State,* 949 A.2d 395, 399 (R.I.2008) (quoting *Smith v. Robbins,* 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000)). Further, Brown also alleged that his trial counsel was ineffective for failing to file a motion for a new trial when he learned from the presentence report that Emily may have attended

Brown's application for postconviction relief involves mixed questions of law and fact that will involve constitutional questions. Accordingly, we review the record *de novo*. *See State v. Campbell*, 691 A.2d 564, 569 (R.I.1997) (citing *Ornelas v. United States*, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (holding that "[i]ndependent review [of constitutional issues] is therefore necessary if appellate courts are to maintain control of, and to clarify the legal principles")).

## A

### Superior Court Decision

The state contends that the hearing justice failed to address the *Strickland* standard when she determined that Brown was deprived of his constitutional right to a fair trial. We agree that the hearing justice could have been more articulate when she applied the two prongs of the *Strickland* test. However, she did say that "[t]his Court is of the opinion that the fairness of his trial was severely compromised by the lack of effective representation, which is his Constitutional entitlement. The convictions are the product of an infirm process resulting in an extinguishment of [the applicant's] core Constitutional rights." It is true that G.L.1956 § 10–9.1–7 requires a court to "make specific findings of fact, and state expressly its conclusions of law, relating to each issue presented." But, the hearing justice could not have ruled that Brown's constitutional rights were violated without first determining that John Brown's performance was deficient and that that deficiency did in fact prejudice Brown's defense.

 The hearing justice discussed a number of factors that contributed to her

finding of ineffective assistance. She reviewed the trial as a whole and did not parse each infirmity that she saw with respect to John Brown's representation. This Court previously has said that a single instance of failure or omission by counsel is unlikely to meet the *Strickland* threshold. *Heath v. Vose*, 747 A.2d 475, 479 (R.I.2000). Instead, when reviewing a claim of ineffective assistance, we look at the entire performance of counsel, and when that performance is deficient in a number of respects, then the possibility is greater that an accumulation of serious shortcomings prejudiced the defendant to a sufficient degree to meet the *Strickland* requirement. *Id.* (holding that privately retained counsel's errors, when viewed in their entirety were so deficient as to deprive a defendant of his rights to effective assistance of counsel and to a fair trial). But, after conducting a *de novo* review of the evidence in the record before us, we conclude that even viewing John Brown's performance at trial in its entirety, his representation of Brown did not amount to ineffective assistance of counsel.

 "An applicant who files an application for postconviction relief bears the burden of proving, by a preponderance of the evidence that such relief is warranted." *Mattatall v. State*, 947 A.2d 896, 901 n. 7 (R.I.2008); *see also Larngar v. Wall*, 918 A.2d 850, 855 (R.I.2007); *Estrada v. Walker*, 743 A.2d 1026, 1029 (R.I.1999); *Jacques v. State*, 669 A.2d 1124, 1129 (R.I.1995). In our opinion, Brown failed to present sufficient evidence to support the hearing justice's finding that John Brown was ineffective in his representation of Brown to the extent required to meet the threshold established in *Strickland*. That is so because, even if we agreed with the hearing

counseling at the Rape Crisis Center, and we will address this issue in this context. Therefore, because the other claims that Brown

raised in his application were not raised in his direct appeal, they are considered waived.

justice that John Brown's performance was seriously lacking, we do not agree that his shortcomings, whether reviewed individually or collectively, prejudiced Brown's defense. As the Supreme Court said in *Strickland:*

"It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, * * * and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052.

Furthermore, the Court said:

"The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

The five instances that the hearing justice found culminated in ineffective assistance of counsel now will be discussed in turn.[17]

### 1

### Janikuak's Testimony

■ The hearing justice first found that Janikuak's testimony concerning her "discernment of truth," amounted to a clear endorsement of Emily's testimony. The statement in question concerned Janikuak's reaction to Emily's allegations of sexual abuse by her stepfather.

PROSECUTOR: "Upon learning this information, what was your reaction? What was your response?

JANIKUAK: "As to what she said to me?

PROSECUTOR: "Yes, without saying what she said.

JANIKUAK: "I was very cautious to make sure that what she was telling me was the truth because we're trained to be sure that just because someone makes an allegation does not mean it's true."

The hearing justice said that "[t]he trial counsel should have specified that his objection to the material was founded on impermissible bolstering." However, the hearing justice should not have revisited this issue during the course of Brown's collateral attack on his conviction. In Brown's direct appeal, we rejected his argument that Janikuak's testimony constituted impermissible bolstering. We held that Brown did not preserve the issue for appeal because John Brown failed to raise a specific objection with the trial justice. At first blush, this would appear to support the hearing justice's conclusion that this error formed a part of the mosaic with respect to John Brown's ineffective representation. But, this Court did not stop with the waiver issue. Indeed, we concluded that even if the testimony had been objected to properly, and thus preserved for appeal, Janikuak's testimony was not impermissible bolstering because, "[t]aking the pastor's statement in the context of her entire testimony, we also believe it is clear that she was not attempting to bolster complainant's credibility, nor would a

---

**17.** We agree with the state that many of the alleged errors that the hearing justice found contributed to her finding of ineffective assistance were not raised by Brown in his application nor did the parties address these potential issues during the postconviction hearings in the Superior Court; and instead, the hearing justice raised them *sua sponte* in her decision. However, given the impact of our decision today, to reinstate Brown's judgments of conviction, we believe it is necessary to discuss these issues as if they had been raised properly.

reasonable jury have so construed her testimony." *Brown*, 709 A.2d at 479.

During the proceedings for postconviction relief, the hearing justice found that John Brown's failure to object to this testimony at trial contributed to her conclusion that he was ineffective. However, to deduce that John Brown was deficient for failing to object to this testimony, the hearing justice first had to find that it constituted impermissible bolstering. The hearing justice said, "[t]he pastor's statement concerning her 'training' regarding discernment of truth constituted, in this Court's opinion, clear endorsement of the victim's testimony." Given that this Court found the bolstering issue to be without merit, then John Brown's failure to specify that his objection was based on impermissible bolstering cannot be considered ineffective assistance because no prejudice could result from such an omission.

Brown asks this Court to reconsider its previous ruling on this issue in light of additional evidence that he says was considered by the hearing justice that was not available to this Court when it decided the direct appeal. Specifically, the hearing justice noted that:

> "Additionally, the very day Janikuak testified against petitioner she was featured in the Channel 12 evening news for performing a miracle by laying her hands on a crippled woman who had not walked in ten years. In fact, Mr. Brown viewed the report that very evening with his attorney. Yet, nowhere in the record is any request by defense counsel to poll the jurors."

Brown contends, and the hearing justice apparently agreed, that this additional evidence added to the risk that the jury would hold Janikuak's testimony in high esteem because she was covered favorably by a local television news station. However, this new information does not change

the fact that this Court ruled that Janikuak's *testimony* was not bolstering. Our decision in Brown's direct appeal did not hinge on whether Janikuak's testimony would be given any heightened import because of her stature in the community; rather, it was because we opined that the specifics of her testimony did not constitute bolstering. This Court concluded that:

> "Significantly, a close look at Janikuak's overall testimony on this point reveals that the pastor herself could not determine whether complainant (in her allegations) or defendant (in his denials) was being truthful. And it also highlights the fact that the pastor was merely attempting to mediate this family crisis while moving cautiously in light of the serious nature of the allegations. Accordingly we conclude that Janikuak's overall testimony could not have been reasonably perceived by the jury as vouching for the credibility of complainant's sexual-abuse allegations." *Brown*, 709 A.2d at 480.

In other words, because our determination that Janikuak's testimony was permissible was based on the content of her testimony and not on who she was, her appearance on the local television news would have had no impact on our decision.

### 2

### Janikuak's Notes

■ The hearing justice also found that John Brown's failure to obtain certain handwritten notes that Janikuak had made during meetings that she had with Emily and Brown contributed to her determination that John Brown had provided ineffective representation during the trial. During Brown's trial, Janikuak was cross-examined about these notes and she described them as "scribbly notes" that she took in the course of her discussions with

Brown. The hearing justice determined that John Brown was ineffective because he "failed to raise a discovery objection and/or to press for production of what may have been critical material in this credibility case." In his response to the state's appeal, Brown contends that "[t]here was simply no reason not to try to obtain the notes." Although we might agree that John Brown may have been deficient because he failed to press for the production of the notes, this alone does not end our inquiry into whether his representation resulted in ineffective assistance of counsel. We cannot escape the conclusion that there is nothing in the record that would allow us to conclude that John Brown's failure to compel production of Janikuak's notes prejudiced Brown in any way. The notes never were produced, even at the postconviction-relief proceeding, and the hearing justice's supposition that Janikuak's notes "may have been critical material" is insufficient to demonstrate the necessary prejudice to Brown that is needed to meet *Strickland's* second prong. In our opinion, the hearing justice erred when she speculated about the importance and assumed impact of the pastor's notes.

### 3

### Doctor Tanguay's Testimony

■ The hearing justice next found that John Brown was ineffective because he failed to object to Dr. Tanguay's testimony about his counseling session with Brown on the grounds that Tanguay, who said that he had "dealt with an awful lot of sex offenders," offered what amounted to expert testimony. Doctor Tanguay further testified that it "is very typical in sexual abuse cases with the offender particularly, there's [*sic*] seems to be some minimization, minimizing of what happened." The hearing justice noted that John Brown compounded his failure to ob-

ject to this material by his own cross-examination. The following exchange between John Brown and Dr. Tanguay occurred during the trial:

JOHN BROWN: "In your meeting with Mr. Brown, you discussed [Emily] and his interaction with [Emily]?

DOCTOR TANGUAY: "Yes.

JOHN BROWN: "Mr. Brown never stated anything about having sexual intercourse with [Emily], did he?

DOCTOR TANGUAY: "Not to my knowledge. I don't recall that detail. I know it's a very serious detail, but I don't recall that—

JOHN BROWN: "Detail?

DOCTOR TANGUAY: "Yeah, but there was sexual contact, abuse.

JOHN BROWN: "I'm sorry. I didn't mean to interrupt you, Mr. Tanguay. Didn't Mr. Brown, in fact, inform you as regards a situation wherein [Emily] had come to him and touched him?

DOCTOR TANGUAY: "I don't recall that.

JOHN BROWN: "That's quite possible?

DOCTOR TANGUAY: "It's possible, but that would have been part of the denial pattern. I think that's the way I would have seen it, I mean.

JOHN BROWN: "The only information—Well, strike that. Besides what you were informed by these two individuals, did you have any other information available to you prior to your speaking with Danny Brown and [Julie]?

DOCTOR TANGUAY: "Only possibly a conversation. I'm sure there was a conversation with [Janikuak] when she made the referral, and as I said, I knew when the couple came up what it was in regard to.

JOHN BROWN: "You would have considered Mr. Brown having stated to you that there was an incident wherein [Em-

ily] had come to him and touched him a denial?

DOCTOR TANGUAY: "I believe that what was going on, as I recall it, was that there was a denial pattern going on, and that would be very typical of that type of an offense, that 'I was seduced,' or—I have dealt with an awful lot of sex offenders, and that would be to me, I would wonder about that and probably would have confronted that.

JOHN BROWN: "When you use the word denial, am I to understand you correctly that you perceive that the individual has committed an act in your mind for which they are not claiming up to?

DOCTOR TANGUAY: "Total. They're not claiming total responsibility, or the extent of the effect. It was like something like, well, that was no big deal, or something; whereas to the child it would be a very big deal[.] So, that type of confrontation is what typically goes on. I've been told by sex offenders that they have been seduced by a two year old, and that type of thing. That's what I'm saying. And I don't recall the exact details of it and of the conversations, it's three years ago. But I do recall that there was an admission of guilt, and when we say denial, it doesn't mean denial that he did it; it means a minimization, minimizing either the effect, or what happened, or—

JOHN BROWN: "So, even Danny Brown telling you outright about the touching incident would still be, no matter what he stated to you, considered a denial?

DOCTOR TANGUAY: "Not necessarily, unless, uh, unless—no, I'm not understanding that this would be considered denial. Let's make it a 'for instance.' If someone tells me, 'Yes, I had sex with this child, but she seduced me,' that is typical denial pattern of the sex offender, and what I would do is I would—I suppose that's a possibility, that's within the realm of possibility.

JOHN BROWN: "I don't want to talk about possibility. I want to talk about this particular meeting with my client, Danny Brown.

DOCTOR TANGUAY: "I do not recall. What I recall is that he made an admission of sexual abuse against his stepdaughter, and it was as the conversation unfolded it was more significant than I had been led to believe in the beginning.

JOHN BROWN: "When you say you were led to believe in the beginning, that was based on what you were informed by Elizabeth Janikuak?

DOCTOR TANGUAY: "And by him in the beginning; 'Yes, we did have some sexual contact.'

JOHN BROWN: "And, are you saying that [Emily] at eight years of age having come up and touched my client, you have constituted being sexual abuse?

PROSECUTOR: "Objection.

DOCTOR TANGUAY: "Well, yes, I would, yes.

JOHN BROWN: "I have no further questions."

The hearing justice found that "[t]he failure to object to this material, and the elicitation of it by defense counsel, constitutes ineffective representation," because Dr. Tanguay's testimony proffered " 'expert' opinion concerning sexual abuse and the defendant's credibility," which constituted impermissible bolstering.

 Before this Court, Brown contends that the hearing justice correctly ruled that this was an error of sufficient magnitude to support his claim of ineffective assistance of counsel because: (1) Dr. Tanguay never was qualified as an expert; (2) there was no foundation establishing

the basis of his opinion; and (3) there is no indication that Dr. Tanguay's testimony would have survived a challenge based on a failure to satisfy the standard for the admissibility of scientific expert testimony. The state argues that it had no reason to question John Brown about his decision not to object to portions of Dr. Tanguay's testimony or the rationale behind his approach to Dr. Tanguay's cross-examination because the issue was not raised in Brown's application nor was it brought to light during his questioning of John Brown at the postconviction-relief hearing. The state argues that it should at least have the opportunity to inquire of John Brown on this issue. We, however, believe this is unnecessary for us to dispose of the issue. While we are mindful of the fact that Brown proceeded *pro se* in his application for postconviction relief, and that *"[p]ro se* litigants are often granted greater latitude by the court, * * * they 'are not entitled to greater rights than those represented by counsel.'" *Jacksonbay Builders, Inc. v. Azarmi,* 869 A.2d 580, 585 (R.I.2005) (quoting *Gray v. Stillman White Co.,* 522 A.2d 737, 741 (R.I.1987)). Brown has failed to meet his burden of proving by a preponderance of the evidence that his application should be granted. He never presented any evidence concerning John Brown's failure to object to Dr. Tanguay's testimony. Furthermore, even if Brown had presented some evidence on this issue and as a result we were to conclude that John Brown was deficient in this regard, there is no evidence that Brown was prejudiced by this deficiency because there was other compelling evidence of Brown's guilt beyond a reasonable doubt. As this Court said during Brown's direct appeal:

> "Most tellingly, [Brown] admitted at trial that his stepdaughter had touched him sexually. Even more damning were [Brown's] admissions to Dr. Tanguay, in the presence of [Emily's] mother. At trial the mother testified that [Brown] told Dr. Tanguay in her presence that he had touched the girl '[t]wo to three times in a month' when Dr. Tanguay pointedly asked him whether there had ever been any sexual abuse. Indeed, [Brown] conceded on the witness stand that he had been referred to Dr. Tanguay for counseling 'because of what happened between me and [Emily].' " *Brown,* 709 A.2d at 475.

Additionally, Emily testified at trial about the abuse visited upon her. There was a plethora of evidence from which the jury could conclude that Brown was guilty beyond a reasonable doubt; this alone prevents us from reaching a conclusion that any potential errors by John Brown prejudiced Brown's defense.

### 4

### Brown's Daughter's Testimony

After discussing Dr. Tanguay's testimony in detail, the hearing justice said that John Brown inexplicably called Brown's daughter, Angela, as a witness. Angela testified that Emily told her that Brown molested her. The hearing justice said that "[i]t is inconceivable to this Court that any competent counsel would employ such a strategy." But during the proceedings for postconviction relief, neither the parties nor the hearing justice elicited any evidence about this issue because Brown did not include it in his application as an issue in which he alleged that John Brown was ineffective. However, after reviewing the record, we are comfortable that even if he had included this issue in his application, the claim lacks merit because John Brown made a tactical decision to call Angela as a witness. Because "[i]t is well established that tactical decisions by trial counsel, even if ill-advised, do not by themselves constitute ineffective assistance of counsel," *Vorgvongsa v. State,* 785 A.2d

542, 549 (R.I.2001) (citing *Toole v. State,* 748 A.2d 806, 809 (R.I.2000)), even if we agreed with the hearing justice's declaration that it was unthinkable to elicit testimony from Brown's daughter that she did not believe Emily, we cannot agree that such a decision justified a finding of ineffective assistance of counsel.

First, Angela testified only *after* Emily had testified that she told Angela about the abuse. Second, Angela testified that she did not believe Emily's testimony and that Emily had displayed no facial expression when she disclosed the abuse. Brown maintains that "[o]ne is hard pressed to imagine that a jury would place much weight on a statement that a daughter did not believe her father's accuser." However, the testimony indicates to us that the attorney attempted to cast doubt on the victim's credibility by offering Angela's testimony. In his closing argument he said:

> "You heard Angela. Angela came and spoke before you, Danny Brown's daughter. She stated that she had a good, reasonably good relationship with Danny. She had been in Danny's presence alone and always felt it was a safe environment. She also stated as to the circumstances under which [Emily] had informed her. If you recall, she said [Emily] said this, without showing emotion."

The hearing justice criticized Brown's strategy concerning Angela's testimony; however, even if this strategy was ill-advised (about which we express no opinion), the hearing justice nonetheless erred when she found that this tactical decision contributed to Brown's deprivation of his right to effective assistance of counsel.

## 5

### Police Reports and Witness Statements

█ The hearing justice also found that John Brown was ineffective because he did not review all the police reports, witness statements, and other discovery materials with Brown before his trial. Brown testified at the postconviction-relief hearing that:

> "I didn't start receiving discovery from Attorney Brown until after I was in prison for a year at the maximum security. I didn't even see any of the motions. The only thing he gave me before trial is a copy of the Grand Jury transcripts. I never even had a copy of the police report until after I was convicted and in jail for a year."

However, Brown also testified that during a meeting in John Brown's office, his attorney let him read a few of the witnesses' statements; nevertheless, he continued to maintain that the only copies of any material he received before his trial were the grand jury transcripts. When she granted Brown's application, the hearing justice said:

> "The first time Mr. Brown saw any police report was after he had been sentenced and in jail for one year. It is unthinkable that effective counsel would not exhaustively review with an accused all police reports and witness statements well in advance of trial to determine if one should go to trial or negotiate a plea."

Although Brown testified that he did not receive copies of the discovery motions or police reports prior to his trial, there is sparse evidence in the record to support a conclusion that John Brown failed to *review* the police reports, witness statements, and other discovery with his client. In fact, there is evidence in the record to the contrary—that John Brown did indeed review these materials with his client. John Brown testified that he remained in constant contact with Brown throughout

the criminal proceedings, had many meetings with his client, and was actively involved in the discovery process based on input he received from Brown.

It is our opinion that the hearing justice erred when she found that John Brown was deficient in this regard because *both* men testified that the lawyer did review discovery materials with his client. Moreover, similar to our analysis of Dr. Tanguay's testimony, even if we assumed that John Brown failed to properly review discovery materials with Brown, an assessment not supported by the record, there is no evidence that this deficiency prejudiced Brown's defense.

■ Brown concedes that the hearing justice did not make a finding as to how any failure to review discovery materials prejudiced him. Brown argues that the hearing justice reviewed all the areas where she believed John Brown misstepped when she decided that the aggregate of his shortcomings prejudiced Brown to such a degree that his constitutional rights were violated. That conclusion, however, must have an adequate foundation in the record because "[a]n applicant who files an application for postconviction relief bears the burden of proving, by a preponderance of the evidence, that such relief is warranted." *Mattatall,* 947 A.2d at 901 n. 7. Brown's task is to demonstrate that John Brown " 'made errors so serious that counsel was not functioning as "the counsel" guaranteed [Brown] by the Sixth Amendment,' and that 'the deficient performance prejudiced the defense [and] deprive[d] [Brown] of a fair trial, a trial whose result is reliable.' " *State v. Brouillard,* 745 A.2d 759, 768 (R.I.2000) (quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052). The record before us is simply devoid of evidence that would demonstrate that John Brown's alleged errors, whether viewed individually or collectively, prejudiced Brown's defense to that degree and deprived him of a fair trial.[18]

## B

### Brown's Cross–Appeal

■ In Brown's cross-appeal, he argues that we can affirm the Superior Court order granting his application for postconviction relief based on alternate grounds, even if we determine that the hearing justice did not rely on them when she found ineffective assistance. It is well settled that this Court can affirm a decision on different grounds from those relied upon by the lower-court justice. *See, e.g., State v. Vocatura,* 922 A.2d 110, 116 (R.I. 2007) ("this Court may uphold a trial justice's decision 'even though the specific grounds relied upon by the justice were *erroneous* ' ") (quoting *State v. Froais,* 653 A.2d 735, 738 (R.I.1995)); *State v. Nordstrom,* 529 A.2d 107, 111 (R.I.1987) ("This [C]ourt on appeal is free to affirm a ruling on grounds other than those stated by the lower-court judge."). In this case, however, it is our opinion that the record is insufficient to provide traction for a holding that Brown was deprived of his right to effective assistance of counsel. Therefore, Brown's cross-appeal is denied.

## 1

### Relationship Between Janikuak, Brown, and Al Brown

■ The hearing justice discussed the relationship between Janikuak, Brown, and Al Brown and said: "The credible evidence, both documentary as well as testi-

---

18. We need not address the other issues that Brown contended contributed to John Brown's ineffective assistance. The hearing justice did not rely on them and we conclude that they are without merit.

monial, which emerged at hearing, proves that Pastor Janikuak did know Al Brown—a fact she flatly denied at trial." However, the hearing justice did not indicate whether this contributed to her finding of ineffective assistance of counsel. Brown argues that in granting his application, "the Superior Court clearly included within its calculus the evidence of the relationship among the Brown cousins and Janikuak," and that the hearing justice was "able to obtain a more complete picture of the relationships among the various individuals, providing an even stronger basis for a finding of bias on the part of Pastor Janikuak." He concludes by arguing that "Janikuak's bias at the time of the trial was a fair question for exploration. [John Brown's] failure to flush out the bases for this cross examination was part of the ineffectiveness of his representation." [19]

The record reveals that John Brown did pursue the issue of Janikuak's bias during the trial but that the trial justice curtailed his line of questioning. Therefore, there seems to be little evidence that John Brown was deficient in this regard. Furthermore, this issue should have been precluded from reconsideration by the Superior Court because this Court already decided the issue in the direct appeal. *See Vorgvongsa*, 785 A.2d at 547–48; *Carillo v. Moran*, 463 A.2d 178, 182 (R.I. 1983). There, Brown identified the trial justice's limitation of Janikuak's cross-examination concerning the lawsuit filed against her by Al Brown as one of the errors that warranted a new trial. *Brown*, 709 A.2d at 473. This Court rejected that claim, and held that the trial justice properly exercised his discretion to limit and control questioning on a collateral matter, and further that any error on this issue was harmless. *Id.* at 473–75. Therefore, this issue cannot contribute to a finding of ineffective assistance of counsel and should not have been reconsidered in the Superior Court.

### 2

### Testimony of Emily's Sister

 In Brown's cross-appeal, he argues for the first time that John Brown was ineffective because he called Emily's sister, Kimberly R., as a witness at trial. Even overlooking its procedural infirmities, this assertion lacks merit because the decision to call Kimberly as a witness and present her testimony cannot be viewed as anything but tactical, and such a decision, even if ill-advised, does not contribute to a finding of ineffective assistance of counsel. *Vorgvongsa*, 785 A.2d at 549. Kimberly testified that she heard from Julie that "something happened" between Brown and Emily. Brown argues that there is "simply no reason to bring out this testimony that the mother told this witness that something happened between the complainant, and the defendant." However, Kimberly also testified that she got ready for school with Emily and that they ate breakfast together each day. John Brown argued that this occurred at the same time that Brown was alleged to have been abusing Emily. In his closing argument, John Brown asked the jury to consider that Emily's testimony was not consistent with what it had heard from Kimberly.

After analyzing the record, it is our opinion that John Brown was attempting

---

**19.** In Brown's application, he argued that the trial justice erred by limiting John Brown's cross-examination of Janikuak concerning her *potential bias;* however, he never included John Brown's failure to further pursue this issue as a potential ground for his ineffective assistance claim, and he raises the issue for the first time on appeal following the Superior Court decision.

to discredit Emily's testimony by casting doubt on her version of events. This of course was purely tactical and therefore, even if ill-advised, under our well settled law, it cannot contribute to a claim of ineffective assistance of counsel. *See Chalk,* 949 A.2d at 400 (tactical decision of trial counsel not to object to amended indictment "was not 'deficient performance'" and could not amount to ineffective assistance of counsel).

### 3

### Rape Crisis Center Records

 Brown's cross-appeal also asks this Court to affirm the vacating of his convictions because the hearing justice apparently determined that John Brown was inadequate because he did not seek certain records from the Rape Crisis Center, where Emily may have received counseling in 1994. The hearing justice said:

"Also, the pre-sentence report reveals that the victim had been going to counseling at the Rape Crisis Center four months before the trial. Yet no records of those sessions were provided to the defendant. During the evidentiary hearing, prosecutor John McMahon testified that he asked the victim about the counseling and received a 'negative response.' He added, '* * * we looked into it * * * she never had counseling * * * only intake.' Yet the pre-sentence report clearly states that '* * * in August of 1994 [Emily] sought counseling with Katy Roth of the RI Rape Crisis Center. She continues to attend bi-weekly counseling sessions.' Despite the surfacing of this information, defense counsel failed to seek those records and/or file a motion for a new trial based upon new evidentiary information."

Brown urges that this was yet another failing of his trial counsel and that the hearing justice's explicit recognition of this failure demonstrates that this contributed to her finding of ineffective assistance of counsel. There is nothing in the record about the nature and extent of the counseling that may have been provided to Emily. In fact, when attorney Ciresi moved to withdraw from this case, she advised the Superior Court that a subpoena *duces tecum* was issued to the Rape Crisis Center by Brown's former counsel and that it responded with a letter stating that there was no record of Emily with the facility. Despite the reference in the presentence report that Emily attended counseling, the fact that the Rape Crisis Center indicated that it did not have a record of Emily makes it difficult for us to rule that John Brown was deficient in this regard or how any potential deficiency could constitute an error so serious that it contributed to a prejudice of Brown's defense and a deprivation of his right to a fair trial.

### 4

### Clergy Privilege

Lastly, Brown argues that the hearing justice erred because she did not find that John Brown's failure to object to clergy testimony under § 9–17–23 was a basis for her finding of ineffective assistance of counsel. The hearing justice did not make any factual findings or legal conclusions concerning this issue, despite Brown's raising of the statutory argument in both his initial and amended application for postconviction relief and in his questioning of John Brown during the postconviction-relief hearing.

The clergy-privilege issue first arose during trial when John Brown cross-examined Janikuak. The following colloquy occurred:

JOHN BROWN: "And I ask you again, other than what my client Mr. Brown informed you and what you were in-

formed by [Emily], you had no other outside information upon which to draw that assessment, is that correct? Yes or no, Miss Janikuak?

JANIKUAK: "I can't answer that because of privileged information.

JOHN BROWN: "Your Honor, could I ask you, may I approach, your Honor?

THE COURT: "No. Take the jury out, please. Please don't discuss the case among yourselves. You may send one or two of you down to the coffee shop and get something to drink.

(WITHOUT JURY)

THE COURT: "What do you say is the purpose of this? It's your witness.

PROSECUTOR: "Your Honor, this is news to me. We are all hearing this for the first time.

THE COURT: "Well, does she have a privilege in your opinion?

PROSECUTOR: "Well—

JANIKUAK: "It was just something that he shared with me privately.

PROSECUTOR: "She's a pastor and it was told in a religious context, I'd have to check the rules of evidence, your Honor, under our privileges. I don't have them right in front of me. I believe we recognize priest's penitence.

THE COURT: "We are not in that area, though, are we?

PROSECUTOR: "Well, I don't know, your Honor, because all I heard was the word privilege and we have a pastor of a church, this being apparently having asked a question about two members of the congregation, so I don't know where this is going, so I can't answer the question any better than I've just attempted to.

JOHN BROWN: "My objection, your Honor, would be in light of the charges against my client in weighing any privilege, which I don't believe there is a privilege under our rules of evidence with respect to the clergy in this context, that is without balance.

THE COURT: "If there is a privilege, your client's privilege, do you waive that privilege?

MR. BROWN: "I don't understand as to what privilege.

THE COURT: "Do you waive it? If there is one, do you waive it?

JOHN BROWN: "I would have to communicate with my client.

THE COURT: "He's sitting there.

JOHN BROWN: "Is she stating that this privilege is my client's privilege?

THE COURT: "Yes. Apparently he told her something, is that correct?

JANIKUAK: "Yes, your Honor.

THE COURT: "Yes. Mr. Brown?

JOHN BROWN: "Yes, your Honor.

THE COURT: "Let me, if I can put it in perspective, and correct me if I'm wrong please, the pastor feels that the communication with a member of her Church; to wit, your client, if she gleaned her information from your client, she feels that would be breaching a confidential relationship with your client; therefore, it being your client's privilege. I'm not sure, though, as a matter of law there is a privilege, but assuming there is, would you waive it?

JOHN BROWN: "I understand the question, your Honor. It's just very difficult without having the information before me. My client indicates to me, Judge, that he's not aware of any such communication or any privilege in existence, or having communicated with her in any manner, so I am basically being asked to make a decision as to what client has informed me he never stated to this individual.

THE COURT: "You would not be breaching any confidence if you state what he said. All right."

Janikuak then testified to something Brown told her about his own background that did not pertain to Emily, and the issue was not pursued further. During the hearing for postconviction relief, Brown, acting *pro se*, questioned John Brown about the clergy-privilege issue:

BROWN: "Do you remember at the trial when Pastor [Janikuak] mentioned that she couldn't answer a certain question you asked because she stated it was privileged?

JOHN BROWN: "Yes.

BROWN: "And you were not aware of the privilege that day and they sent the jury out and we had a discussion?

JOHN BROWN: "That's not correct.

BROWN: "Why is it not correct?

JOHN BROWN: "Because in my statement to the Judge in the transcript it indicates that as the privilege existing within the particular context, so that's why it's not correct.

* * *

BROWN: "It's all part of the brief. Were you aware that basically what Pastor [Janikuak] basically told the secret Grand Jury Indictment and at the trial the State violated this privilege which I have a copy of the privilege right here, if you'd like to review it?

JOHN BROWN: "Could you rephrase the question please, Mr. Brown?

BROWN: "Were you aware that by having [Janikuak] testify against me at the secret Grand Jury Indictment and at the trial, she basically claimed allegations that I told her things in confidence at the church, did you realize this was violating state law, state statute 9–17–23 at the time?

JOHN BROWN: "No. No.

BROWN: "Would you like to review the State statute, Mr. Brown, for the record? Basically, I was lead to believe there was no such privilege from what took place at trial.

JOHN BROWN: "I've reviewed the document.

On appeal, Brown argues that John Brown never identified the privilege as a possible basis for excluding portions of Janikuak's and Dr. Tanguay's testimony concerning their communications with Brown. He argues that even if we conclude that the hearing justice erred when she granted Brown's application for the reasons set forth in her decision, we nonetheless should affirm because of John Brown's failure to object, under § 9–17–23, to certain portions of Janikuak's and Dr. Tanguay's testimony. We disagree. First, after a thorough review of the record, we are of the opinion that the privilege did not apply to Dr. Tanguay. Second, even if John Brown was deficient by not raising the privilege with respect to portions of Janikuak's testimony, we believe that there was ample evidence other than Janikuak's testimony sufficient for a jury to convict Brown. Therefore, Brown has failed to demonstrate how this potential error by his counsel prejudiced his defense.

### Doctor Tanguay

■ At the time of Brown's trial, § 9–17–23, entitled "Privileged communications to clergymen," provided:

"In the trial of every cause, both civil and criminal, no clergyman or priest shall be competent to testify concerning any confession made to him in his professional character in the course of discipline enjoined by the church to which he belongs, without the consent of the person making the confession. No duly ordained minister of the gospel, priest or

rabbi of any denomination shall be allowed in giving testimony to disclose any confidential communication, properly entrusted to him in his professional capacity, and necessary and proper to enable him to discharge the functions of his office in the usual course of practice or discipline, without the consent of the person making such communication."

Brown contends that any communications between him and Dr. Tanguay were confidential and thus privileged under the statute. Relying on *In re Grand Jury Investigation,* 918 F.2d 374 (3d Cir.1990), he argues that even though portions of the discussion between Brown and Dr. Tanguay took place in Julie's presence, this should not defeat the privilege. In *In re Grand Jury Investigation,* the government appealed from the denial of a motion to compel a Lutheran clergyman to give federal grand jury testimony concerning subjects discussed during a family counseling session. *Id.* at 376. The family counseling session involved five people: the pastor, a husband and wife who were members of the pastor's church, the wife's adult son from a previous marriage, and the son's fiancée. *Id.* On appeal, the government contended that even if a clergy privilege existed under federal common law, the pastor should not be allowed to invoke the privilege because of the presence of the son's fiancée, who was not yet a member of the family. *Id.* at 377. The government argued that her presence "was neither essential to nor in furtherance of any religiously motivated communications to the pastor on the part of the others present and therefore worked either to vitiate or to waive any privilege." *Id.* The court held that:

"[T]he privilege should apply to protect communications made (1) to a clergyperson (2) in his or her spiritual and professional capacity (3) with a reasonable expectation of confidentiality. As is the case with the attorney-client privilege, the presence of third parties, if essential to and in furtherance of the communication, should not void the privilege." *Id.* at 384.

Brown maintains that because Julie was essential to and in furtherance of his communications with Dr. Tanguay, her presence should not obviate the privilege. Therefore, he argues, because the privilege was not destroyed by Julie's presence, John Brown was ineffective for failing to object to Dr. Tanguay's testimony. Yet, we need not decide this issue today to dispose of Brown's argument. We say this because whether or not the presence of third parties, in this case, Julie, destroyed the privilege, we believe that in this instance, Dr. Tanguay was not acting in the capacity of a pastor.

Doctor Tanguay undeniably was a pastor, but any information he received from Brown was not properly entrusted to him in that capacity, nor was it "necessary and proper to enable him to discharge the functions of his office in the usual course of practice or discipline." Section 9–17–23. Simply because one communicates with a clergyman does not mean that every communication is properly entrusted to the individual in that capacity. There is no indication that the meeting, which Dr. Tanguay described as a "consult * * * to see if there was any interest in their getting into therapy for the alleged problem," was conducted with him in his capacity as a pastor of the Connecticut church. Indeed, Janikuak testified that she referred Brown and Julie to Dr. Tanguay because he possessed a greater level of expertise in therapeutic counseling than she could provide. Therefore, because we believe that Dr. Tanguay was not acting in his professional capacity as a pastor during his communications with Brown, and thus the privilege did not apply to these discussions, we do

not, at this time, need to address the impact that the presence of third parties has on the privilege.

### Janikuak

 Although Dr. Tanguay was not acting in his professional capacity as a pastor during his consultation with Brown, the same cannot be said about Janikuak. Emily was involved with church activities and Brown was a member of the congregation. When Janikuak first learned of Emily's allegations, she called Brown into her office in the church to discuss a "very serious matter." She then followed up with Emily and relayed to her that Brown had denied her allegations. Given the nature of the relationship between Janikuak and Brown, one that was vastly different from Brown's incipient relationship with Dr. Tanguay, it is clear that Janikuak did act in her capacity as a pastor and spiritual counselor when she spoke with Brown about Emily's allegations of sexual abuse. Therefore, without Brown's consent, Janikuak should not have been allowed to "disclose any confidential communication" during her testimony that was properly entrusted to her. The transcript is not entirely clear, but it seems to indicate that at least the initial conversations between Brown and Janikuak were confidential. However, even if we assume that they were confidential and thus John Brown was deficient for failing to object to her testimony about these discussions, that alone is not sufficient for Brown to meet the heavy burden that he bears. As we repeatedly have said "an applicant bears the burden of proving, by a preponderance of the evidence, that he is entitled to post-conviction relief." *Chalk,* 949 A.2d at 398 (quoting *Burke,* 925 A.2d at 893). For Brown to prevail, he must establish that, not only was John Brown's performance deficient, but that his errors prejudiced the defense to such a degree that Brown was deprived of his right to a fair trial. In our opinion, Brown has not sustained his burden of proof because he has not presented any evidence that his defense was prejudiced.[20] Even if Janikuak's testimony about her confidential communications with Brown was excluded, there was other compelling evidence of his guilt that was more than sufficient for the jury to convict Brown beyond a reasonable doubt. Brown admitted during the trial to sexual contact with Emily.[21] The young girl also testified

---

20. In Brown's application, he argued:

"If the Defendant was allowed to adequate Counsel, the verdict would have been a different out come [sic] in this illegal case. The prosecution treated this case as if playing poker and holding their hand very close to their chest with a few cards up their sleeves. The Trial Attorney did not show the Jury all of the perjury that the State Witnesses presented during this trial. This is a credibility case yet the perjury went uncorrected."

In his amended application, he argued that John Brown "should have known that this was privileged and he should have argued this or at least picked up the R.I. General Rules book when he objected to this at the trial and then stated on the record that he did not know if such a privilege existed." However, despite these claims, Brown does not present any specific evidence that but for this apparent error or, in fact, any of the other claimed errors by his trial counsel, the result of his trial would have been different.

21. In attorney Ciresi's no-merit memorandum, she said:

"Although counsel disagrees with the manner in which defense counsel represented [Brown], his performance did not amount to ineffective assistance of counsel. Arguably, if defense counsel's performance did amount to ineffective assistance of counsel, the verdict, in all probability, would have been the same.

"It is counsel's opinion that the most damaging information presented to the jury was [Brown's] admission of sexual contact between [Emily] and himself. [Brown] testified that he was asleep on the couch [and]

about the abuse visited upon her. Furthermore, even if Dr. Tanguay's testimony that Brown contends constituted expert opinion was disallowed, Dr. Tanguay still testified that Brown's reaction to the question of whether any sexual abuse occurred, was "one of admission, yes, something of a sexual nature did occur," between Emily and him. Lastly, Julie testified at the trial that during their counseling session, *Brown told Dr. Tanguay in her presence* that he had abused the girl "[t]wo to three times in a month." For these reasons, we hold that, irrespective of whether John Brown was deficient for failing to object to Janikuak's testimony under § 9–17–23, Brown has failed to demonstrate that there is a reasonable probability that, but for John Brown's errors, the result of the trial would have produced a different result.

---

was awake[ned] because [Emily] had placed her hand under his underwear and began fondling his penis. The jury obvious [*sic*]

## IV

### Conclusion

For the foregoing reasons, we vacate the order of the Superior Court granting Brown's application for *postconviction relief*, and we reinstate the judgments of conviction. The record shall be remanded to the Superior Court for proceedings consistent with this opinion.

Justice GOLDBERG did not participate.

---

disbelieved [Brown's] version of events. In all likelihood, a different jury would choose to reject this testimony."